Cicio v. Bernasconi, No. 20-1-09 Oecv (Eaton, J., Mar. 24, 2011)

[The text of this Vermont trial court opinion is unofficial.  It has been reformatted from the original.  The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

STATE OF VERMONT

| | |
|---|---|
| SUPERIOR COURT | CIVIL DIVISION |
| Orange County | Docket No. 20-1-09 Oecv |

Tonya Cicio
      Plaintiff

v.

Jay Bernasconi
      Defendant


Findings of Fact, Conclusions of Law, and Order

Plaintiff Tonya Cicio seeks partition of real estate she currently owns as a tenant-in-common with her former romantic partner, defendant Jay Bernasconi.  For the following reasons, plaintiff is entitled to a judgment of partition stating that she is entitled to a 60% share of the property, while defendant is entitled to a 40% share of the same.

*Findings of Fact*

The following facts were established by the credible evidence presented at the merits hearing held on December 20, 2010.  Ms. Cicio and her former husband bought a home and seven acres located at [address redacted] in Orange, Vermont, in 1986 for the price of $46,000.  Ms. Cicio was awarded the home in a final divorce order after she and her former husband were divorced in 1999.

Between 1999 and 2006, Ms. Cicio was responsible for all of the property expenses, including mortgage, taxes, insurance, and maintenance.  She worked at a supermarket deli for most of this time, but at some point suffered a work-related wrist injury and received a lump sum award of workers' compensation benefits.  She has not returned to work since the injury.

By 2006, Ms. Cicio was struggling to make ends meet.  She admits several late mortgage payments but denies that the home actually went into foreclosure.  Nevertheless, she owed $20,229.08 on the mortgage by the end of October 2006 (D. Ex. F), and the house had fallen into disrepair, including most notably a leaking roof and sluggish septic system.

During the fall of 2006, Ms. Cicio decided to marry Mr. Bernasconi, whom she had been dating for eleven years.  Because they were planning to move in together at the [address redacted] home, they began making plans to fix up the home and add an extra bedroom for Mr. Bernasconi's son.  Ms. Cicio, however, had a poor credit rating and could not refinance the home on her own.  In addition, the bank made clear that it would

not approve any new financing on the home until the roof was repaired. For these reasons, the parties determined to fix the roof and to seek new financing using Mr. Bernasconi's credit rating.

Mr. Bernasconi fixed the roof using $3,500 he borrowed for the purpose. He then sought to refinance the home. He could not do this unless he was on the deed, so the parties arranged for Ms. Cicio to sell the property to herself and Mr. Bernasconi as tenants in common for the contract price of $24,500. Mr. Bernasconi was able to use his good credit rating to obtain financing for this transaction in the amount of $19,600, which, together with $4,202.45 of his own cash, allowed them to pay off the existing mortgage on the home and the closing costs for the transaction. (D. Ex. F). Mr. Bernasconi then supposedly contributed an additional $4,256.52 in cash to Ms. Cicio at the closing in order to reach the purchase price, but she turned around and gave this cash back to him as compensation for the roof repairs. Although this last part of the transaction is rather mysterious to the court, it is evidence that the parties felt as though the roof expenses were settled as between them.

A complication here is that Ms. Cicio asserted at trial that she did not understand that the refinancing would result in Mr. Bernasconi becoming a co-owner of the home. She did not like this because of the inheritance implications for her children and Mr. Bernasconi's son, and she further claims that she agreed to put him on the deed as an owner of an undivided one-half interest in the property only upon the understanding that this could be changed after closing. Yet no agreements to that effect were reduced to writing, and Ms. Cicio voluntarily signed the deed and the property transfer tax return, both of which clearly indicated that she was transferring a one-half interest in the property to Mr. Bernasconi. Moreover, the credible evidence is that she did this knowingly and voluntarily; she was having trouble making ends meet and needed the financing in order to meet her existing mortgage obligations. She also intended to marry Mr. Bernasconi and needed his credit to obtain funds to fix up the home she intended to share with him. In short, the credible evidence was that this was a voluntary transaction in which she understood the legal ramifications for the property.

As the final step to the refinancing, the parties applied for a line of credit on the home in the amount of $75,000. Again, the line of credit was made possible by Mr. Bernasconi's credit rating. Of this amount, the parties used approximately $60,189 towards the addition of two bedrooms onto the home and other minor repairs (but they did not replace the leach field). (Def. Ex. B). Other miscellaneous expenses were charged to the line of credit that had nothing to do with the house: $5,250 for eye surgery for defendant's father, $750 for back rent owed by defendant, and $1,140 for veterinary bills incurred by the need to care for Ms. Cicio's dog. (Def. Ex. B). Because these miscellaneous expenses were charged to the line of credit, they are debts secured by the property.

Mr. Bernasconi and Ms. Cicio did not marry, but rather experienced a parting of the ways in fall 2007, resulting finally in Mr. Bernasconi's decision to move out of the home in December 2007. His departure was not the result of a relief-from-abuse order or

a changing of the locks; he simply decided that he was not getting along with Ms. Cicio and that it was time to leave. He claims that she drank more than he thought, but this is not credible given that he dated her for nearly eleven years before moving in with her.

Between the time of refinancing and the end of the relationship, Mr. Bernasconi made the monthly payments on the bank loans ($426 per month on the primary loan plus whatever varying amount was due on the line of credit). (P. Ex. 4). He paid a total of $11,843. (D. Ex. A). He has not made any payments since April 2008.

Ms. Cicio cannot afford the payments on her own. After the bank threatened foreclosure for lack of timely payment, her parents generously offered to begin paying the mortgage and the amounts due on the line of credit. It appears that they took out a mortgage on their own home to do this. On behalf of Ms. Cicio, they paid $21,682 between April 2008 and the close of the evidence. (P. Ex. 4).

An appraisal of the home in September 2010 found a fair market value of $170,000. (D. Ex. H). As of December 1, 2010, the mortgage had an outstanding balance of $16,072.16 and the line of credit had an outstanding balance of $72,332.30, for a total debt of $88,404.46. (P. Ex. 1). Total equity in the home is $81,595.54.

The parties presented conflicting evidence about the value of the home at the time Mr. Bernasconi purchased his one-half interest in the home. For the reasons explained below, this value is not material to the decision, but for purposes of argument, the preponderance of the evidence established the value of the home to be $106,500. This figure represents the known present value of the home ($170,000) minus the amount of construction that went into the home between summer 2006 and present ($60,000+/- on the line of credit plus $3,500 for the new roof).

*Conclusions of Law*

Although partition actions are often used to disentangle the property interests of former unmarried romantic partners, the statutory cause of action is not meant to serve as "a pseudo-divorce distribution of assets and debts." *Whippie v. O'Connor*, 2010 VT 32, ¶ 15 n.3, available at http://info.libraries.vermont.gov/supct/current/op2007-473.html. It is instead a procedure for separating shared interests in real estate according to the principle that cotenants should "equally share both the burdens of land ownership . . . as well as the benefits." *Massey v. Hrostek*, 2009 VT 70, ¶ 21, 186 Vt. 211 (quotation omitted). A judgment for partition takes into consideration all of the equities arising out of the shared ownership of the property. *Begin v. Benoit*, 2006 VT 130, ¶ 6, 181 Vt. 553 (mem.); *Boulette v. Boulette*, 627 A.2d 1017, 1018 (Me. 1993) (cited in *Massey*, 2009 VT 70, ¶ 17).

Partition actions ordinarily begin with the presumption that cotenants share equally in the property. 27 V.S.A. § 2(b); *Whippie*, 2010 VT 32, ¶ 16; *Massey*, 2009 VT 70, ¶ 17. Most of the evidence and argument in this case was directed to the question of whether the presumption should apply here given the parties' contributions to the

3

establishment of the cotenancy. Because this was the most important issue in the case, the court addresses each of the relevant arguments seriatim.

Ms. Cicio argues first that Mr. Bernasconi does not have any vested interest in the property because she rebutted the presumption of donative intent, as that term is used in *Massey* and *Brousseau v. Brousseau*, 2007 VT 77, 182 Vt. 533 (mem.). Both of those cases, however, involved the act of titling property in another's name without any supporting consideration, and the question of whether the existing owner thereby intended to make a present gift of real property, e.g., *Massey*, 2009 VT 70, ¶ 17, or was rather making estate-planning arrangements, e.g., *Brousseau*, 2007 VT 77, ¶ 8. Both cases are inapposite here because the record shows that Ms. Cicio sold a one-half interest in the property to Mr. Bernasconi in exchange for valuable consideration (not the least of which was the ability to refinance the property and thus stave off potential foreclosure). An analysis of donative intent is unnecessary here.

Ms. Cicio argues second that she did not understand that she was transferring property ownership to Mr. Bernasconi, or that she did so only upon the understanding that the deed would be changed after closing. For the reasons explained in the findings, the court does not find her assertions on this point to be credible. A preponderance of the evidence established that the transaction was a voluntary one whose legal ramifications were understood by Ms. Cicio.

Ms. Cicio argues third that the court should consider the parties' respective contributions to the establishment of the cotenancy. Another way of expressing the same argument is that Ms. Cicio believes that the parties' ownership shares should be determined by their capital contributions to the property. The existing cases clearly discourage this approach. See *Massey*, 2009 VT 70, ¶ 17 (holding that co-owner who contributed nothing to the purchase of the property was nevertheless the owner of an equal share); *Boulette*, 627 A.2d at 1018 (holding that plaintiff who owned home should not be credited with its equity value at the time she transferred the property to herself and her romantic partner). The reason for this is that partition does not involve an equitable distribution of the assets and debts of the parties, but rather a shared division of the benefits and burdens of the property. As such, contributions by the parties to the purchase of the property are not considered; it is only those expenses and benefits that arise out of the shared ownership itself that are properly subject to equitable consideration. *Massey*, 2009 VT 70, ¶ 17; *Boulette*, 627 A.2d at 1018.

Moreover, consideration of the respective contributions would only reaffirm the application of the statutory presumption in this case. Solely for the sake of argument, Ms. Cicio contributed the existing equity in the home, which was about $86,000 as measured by its fair market value minus the mortgage. Mr. Bernasconi contributed the borrowing power needed to refinance the home and to take out the line of credit, which together contributed about $80,000 to the property. It may be true that Mr. Bernasconi's contributions were in the form of access to credit rather than equity, but the infusion of credit was needed to stave off foreclosure. It should also be recognized that Mr. Bernasconi assumed a substantial amount of financial risk by taking out the loans. In

4

short, both parties contributed to the establishment of the cotenancy, and there is nothing unfair about the application of the statutory presumption of equal ownership in this case.

Having established that each party owns an equal share of the property, the court turns to the accounting. The first step is to "split the property in half." *Whippie*, 2010 VT 32, ¶ 15. Existing equity in the home is $81,595.54; equal shares of the equity are thus $40,797.77 as a starting point.

Next, the court determines whether either cotenant has paid more than their fair share of property-related expenses. "In calculating any reimbursement due, the court must account for all of the property expenses paid by each party." *Id.*, ¶ 16. Here, Mr. Bernasconi contributed $11,843 to the realty expenses, whereas Ms. Cicio contributed $21,682 thanks to the generosity of her parents.[1] Equal shares would have been $16,762.50 apiece. Ms. Cicio is therefore credited for her overpayment in the amount of $4,919.50 and Mr. Bernasconi's share is reduced by the same.

Next, the court is instructed to award credit for any "offset claims based on ouster," *id.*, ¶ 19, but for the reasons expressed in the findings of fact, there was no ouster here. Mr. Bernasconi left the relationship and the property willingly and of his own accord, and without any "overt and notorious act or acts of an unequivocal character, indicating an assertion of ownership of the entire premises to the exclusion of the right of the co-tenant." *Id.* (quotation omitted).

Next, the court must consider other equities cognizable in the partition. *Id.*, ¶¶ 24–28. One of the possible equities argued by the parties is their respective contributions to the establishment of the cotenancy, but *Massey* makes clear that this is not a factor that supports an award of additional equitable consideration. See also *Whippie*, 2010 VT 32, ¶ 25 (explaining that "[t]he fact that plaintiff applied for and was a necessary cosigner with defendant on the mortgage application may support the presumption that she owns an undivided one-half interest in the property, but lends nothing to her claim for additional equitable consideration"). And even if the court were to consider the contributions of the parties, they were roughly equal in this case.

Nor will the court make an equitable adjustment for the roof repairs or the fact that the septic system remains sluggish. The credible evidence established that the parties settled the roof repairs between themselves at the closing, and the parties share responsibility for the decision to use the line of credit to add bedrooms to the home rather than replace the leach field. Any marketability consequences arising from that choice will have to be shared by the parties.

---

[1] Payments made by Ms. Cicio's parents have been credited to Ms. Cicio for purposes of accounting in the partition action. It would not be fair to discount the payments solely because they were made by Ms. Cicio's parents on her behalf. Although the court hopes that Ms. Cicio's parents will be compensated by the proceeds from any eventual sale of the property, the question of reimbursement is ultimately a Cicio family matter rather than an issue for resolution by this court in this partition action.

Some adjustments are appropriate, however, for the miscellaneous expenses charged to the line of credit. *Begin*, 2006 VT 130, ¶ 9. Mr. Bernasconi charged $6,000 to the account for eye surgery and back rent, and that separate debt is properly attributed to him. It appears from the evidence that the parties made a joint decision to charge the veterinary bills to the line of credit, and so no adjustment is made for that. Costs are apportioned between the parties according to their respective shares. *Whippie*, 2010 VT 32, ¶ 30.

Ms. Cicio's share of the equity is therefore $48,717.27 ($40,797.77 starting share, plus $4,919.50 credit for mortgage payments, plus $3,000 credit for miscellaneous expenses attributable to defendant). Mr. Bernasconi's share of the equity is $32,878.27 (starting share minus $4,919.50 for mortgage underpayments, minus $2,500 for miscellaneous expenses attributable to him). As expressed as a share of overall equity, Ms. Cicio's share is 60%, and Mr. Bernasconi's share is 40%.

In the event of an assignment, of course, the parties would need to compensate the other for their equity share of the property and refinance the existing debts in their own name at whatever amount is then due. Based on the debt amounts as of December 1, 2010, therefore, Ms. Cicio would need to come forward with $121,282.73 in order to take assignment of the property, whereas Mr. Bernasconi would need to come forward with $137,121.73 to accomplish the same.

At this point, the statutory procedures contemplate that the court will enter judgment for partition and then appoint commissioners to determine whether the property can be physically divided without great inconvenience to the parties interested, or whether one of the parties will take assignment of the property, or whether the property should be sold. 12 V.S.A. §§ 5169–5176; *Wilk v. Wilk*, 173 Vt. 343, 347–47 (2002). Either party may nominate up to three disinterested residents of Orange County to serve as commissioners by submitting those names to the court within thirty days, or the parties may agree on the commissioners within the same time period, having in mind that the commissioners are to be compensated in accordance with 12 V.S.A. § 5181.

## ORDER

(1)     Plaintiff Tonya Cicio is entitled to a judgment of partition. A final judgment order shall issue separately.

(2)     Either party may nominate up to three disinterested residents of Orange County to serve as commissioners by submitting those names to the court within thirty days, or the parties may agree on the commissioners within the same time period.

Dated at Chelsea, Vermont this _____ day of March, 2011.

_____
Harold E. Eaton, Jr.
Superior Court Judge